IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
January 5, 2021 Session

## CEDRA DEANNTRE POTTS (TAYLOR) v. STARR ANASTASIA POTTS

**Appeal from the Circuit Court for Davidson County**
**No. 17D1366      Phillip Robinson, Judge**

_____

### No. M2020-00170-COA-R3-CV

_____

This appeal arises from the denial of the plaintiff's Tenn. R. Civ. P. 60.02 motion requesting relief from an agreed-upon permanent parenting plan that was approved by the court and incorporated into the final divorce decree. The plaintiff contended that the defendant spouse lacked standing to seek custody and visitation of the minor children, who were conceived by in vitro fertilization;[1] therefore, the permanent parenting plan was void for lack of subject matter jurisdiction, i.e., standing was jurisdictional. The material facts are that the couple entered into a contract with a reproductive clinic in October 2013 to perform an in vitro fertilization procedure, with each party signing the contract as "Prospective Parent." The reproductive clinic impregnated the plaintiff with embryos created from the plaintiff's eggs and donated sperm. As a result of the procedure, the plaintiff gave birth to twins in July 2014. The parties, a same-sex couple, married in June 2015, shortly following the United States Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015). In August 2017, the plaintiff filed for divorce, contending there were no children born of the marriage, and the defendant filed an answer and a counter-complaint alleging there were two children born of the marriage and requesting that the court designate her as the primary residential parent. After the parties resolved all issues, the trial court entered a final divorce decree, incorporating an agreed-upon permanent parenting plan that (1) stated the children were a product of the parties' marriage, (2) designated the plaintiff as the primary residential parent with 240 days of parenting time per year and designated the defendant as the alternate residential parent with 125 days of parenting time, (3) provided for joint decision-making authority, and (4)

_____

[1] Merriam-Webster's Dictionary defines "in vitro fertilization" as "fertilization by mixing sperm with eggs surgically removed from an ovary followed by uterine implantation of one or more of the resulting fertilized eggs." "In vitro fertilization." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/in%20vitro%20fertilization (last visited May 28, 2021). The applicable statutes—Tenn. Code Ann. §§ 36-2-401 to -403—primarily use the term "embryo transfer," which is defined as "the medical procedure of physically placing an embryo in the uterus of a female recipient intended parent." Tenn. Code Ann. § 36-2-402(4). The terms "in vitro fertilization" and "embryo transfer" are used interchangeably throughout this opinion.

ordered the defendant to pay child support. Three months after the divorce decree became a final judgment, the plaintiff filed the Rule 60.02 motion at issue in this appeal. Following briefing and a hearing, the trial court determined that the defendant was able to establish parentage under Tenn. Code Ann. § 36-2-403 because she met the requirements of the statute, in that she was a party to the written contract consenting to the in vitro fertilization procedure, and she accepted full legal rights and responsibilities for the embryos and any children that resulted. The trial court also determined that the defendant was entitled to the presumption that she was the children's parent in accordance with § 36-2-304(a)(4) because the defendant held the children out as her natural children. For these and other reasons, the trial court denied the plaintiff's Rule 60.02 motion for relief. This appeal followed. Because the custody and visitation statutes specifically provide that only a parent has standing to seek custody and visitation in a divorce action, "the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn v. Marr*, 127 S.W.3d 737, 740 (Tenn. 2004). Therefore, the defendant must fit the statutory definition of "parent" for the court to have jurisdiction to grant visitation. Tennessee Code Annotated § 36-2-403 provides the single means of establishing the parentage of children born as a result of the in vitro fertilization procedure. *See* Tenn. Code Ann. § 36-2-401. Contrary to the plaintiff's contention that all of the gametes (both the sperm and the egg) must be donated for § 36-2-403 to apply, we read the statute as addressing situations such as this one, where only half of the gametes are donated, as well as situations where all of the gametes are donated. Because the defendant contractually agreed to accept full legal rights and responsibilities for the embryos and any children produced as a result, the defendant is presumed to be the children's parent under § 36-2-403(d); therefore, the defendant had standing to seek custody and visitation in the underlying divorce action. Accordingly, the trial court had subject matter jurisdiction over the controversy. For these reasons, we affirm the trial court's decision to deny the plaintiff's Rule 60.02 motion for relief from the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT, J. and J. STEVEN STAFFORD, P.J., W.S., joined.

Lorraine Wade, Nashville, Tennessee, for the appellant, Cedra Deanntre Potts (Taylor).

Starr Anastasia Potts, Nashville, Tennessee, pro se.

**OPINION**

Prior to the legal recognition of same-sex marriage, Cedra Deanntre Potts (Taylor) ("Plaintiff") and Starr Anastasia Potts ("Defendant") participated in two civil union ceremonies, one in January 2008 and the other in September 2013. Shortly following their

second ceremony, the couple decided to have children together through an in vitro fertilization procedure.

To that end, they entered into a contract with Georgia Reproductive Specialists in Atlanta, Georgia, in October 2013[2] to impregnate Plaintiff with embryos created from Plaintiff's eggs and donated sperm. The contract consisted of several documents, with each party signing as "Prospective Parent" or with Plaintiff signing as "Patient" and Defendant signing as "Partner." The documents included (1) a "Consent to Accept Anonymous Donated Sperm," with both signing as "Prospective Parent;" (2) a "Receipt of Cryopreserved Sperm from Other Institutions," with Plaintiff signing as "Patient" and Defendant signing as "Partner;" and (3) an "Informed Consent," with Plaintiff signing as "Patient" and Defendant signing as "Partner." It is undisputed that Defendant paid for the procedure.

The procedure was successful, and Plaintiff gave birth to twin girls in July 2014. Thereafter, Plaintiff stayed home with the children, and Defendant co-parented the children while working outside the home. Defendant listed Plaintiff and the children as dependents on her work-related medical insurance and as beneficiaries on her life insurance. And, while Defendant did not adopt the children, nor was she listed as a parent on the children's birth certificates,[3] the children shared Defendant's last name of Potts because Plaintiff legally changed her name to Potts prior to the children's birth.

The parties were legally married on June 28, 2015, shortly following the United States Supreme Court's decision in *Obergefell.* Thereafter, the couple experienced marital problems and, on August 3, 2017, Plaintiff filed a complaint for divorce claiming there were no children born of the marriage. Defendant filed an answer and counter-complaint alleging there were two children born of the marriage and requesting that the court designate her as the primary residential parent. Plaintiff filed an answer denying Defendant was the legal parent of the children.

On March 22, 2018, Plaintiff filed a motion for partial summary judgment asking the court to summarily dismiss Defendant's petition for custody of the children. Plaintiff claimed it was undisputed that Defendant was not the biological parent of either child, never adopted the children, and was not legally married to Plaintiff at the time of the children's birth. As such, Plaintiff contended that Defendant was not a parent under Tennessee law, and consequently, she lacked standing to seek custody of the children.

---

[2] Some of the documents were signed in October 2013, and some were signed in November 2013.

[3] We recognize that some states have refused to list the birth parent's same-sex spouse or partner on the child's birth certificate. *See Pavan v. Smith*, --- U.S. ----, 137 S. Ct. 2075, 2078 (2017).

In her response, Defendant relied on Tenn. Code Ann. § 36-2-304, which provides that "[a] man is rebuttably presumed to be the father of a child if . . . [b]efore the child's birth, the man and the mother have attempted to marry each other in compliance with the law, although the attempted marriage is or could be declared illegal, void and voidable[.]" *Id*. § 304(a), (a)(2). Defendant argued it was undisputed that the parties participated in two civil union ceremonies prior to the children's birth and conducted themselves as if they were married. Defendant further argued that, though Tennessee's parentage statutes used masculine terms, the statutes should apply equally to a woman who is married to another woman, or to a woman who becomes a parent with another woman.

After a hearing, the court entered an order on August 10, 2018, denying Plaintiff's motion for partial summary judgment, stating:

> Considering all of the foregoing and based on this Court's understanding of the facts in this case, the Court concludes that this is one of those cases where the state's current paternity and related statute are of limited benefit in determining parentage in the age of modern reproductive technology, especially considering the competing rights and interests of the parties and children. . . . [T]his Court concludes that it is incumbent on the trial court to garner all of the facts in this case in a full hearing on the merits, thereby preserving them for appellate review. This Court's resulting decision on the issue of parentage may then be scrutinized against the background of all of the facts in the case rather than those limited material facts agreed to by the parties in [Plaintiff]'s motion for partial summary judgment.

Over the next several months, the parties settled their differences and, on March 18, 2019, the court entered the final divorce decree, incorporating an agreed-upon permanent parenting plan that stated the children were a product of the parties' marriage, Defendant would be added to the children's birth certificates, Plaintiff would be the primary residential parent with 240 days of parenting time per year, and Defendant would be the alternate residential parent with 125 days of parenting time. Defendant also agreed to pay Plaintiff $1,953 per month in child support, and the permanent parenting plan provided for joint decision-making authority. Neither party appealed, and the divorce decree became a final judgment on April 17, 2019.

Three months later, on July 18, 2019, Plaintiff filed a Rule 60.02 motion requesting relief from the final judgment as it pertained to the permanent parenting plan, contending it was void for lack of subject matter jurisdiction.[4] In essence, Plaintiff's argument rested

---

[4] Under Tenn. R. Civ. P. 60.02, a party may be entitled to relief from a final judgment for five reasons: "(1) mistake, inadvertence, surprise or excusable neglect; (2) fraud . . . ; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged . . . ; or (5) any other reason justifying relief

on the premise that the court's power to adjudicate a custody dispute in the context of a divorce action was limited by the parental status of the litigants before it, i.e., the court had no power to grant custody and visitation to a non-parent. Plaintiff argued that Tennessee's presumption of parentage statute, Tenn. Code Ann. § 36-2-304, did not apply to Defendant because it addressed questions of paternity, and Defendant was not a man. Plaintiff also argued that the statutes establishing parentage in cases of in vitro fertilization, Tenn. Code Ann. §§ 36-2-401 to -403, applied only when the embryos were donated, and Plaintiff's embryos were not donated; they were created from her eggs.

Defendant did not file a written response to Plaintiff's motion; however, her attorney argued on her behalf at the motion hearing conducted on September 20, 2019. Defendant's attorney primarily argued that Tennessee's presumption of parentage statutes should be interpreted in a gender-neutral manner in light of the U.S. Supreme Court's decision in *Obergefell*. At the conclusion of the hearing, the court took the matter under advisement.

The trial court entered an order on November 13, 2019, denying Plaintiff's motion for relief from the judgment. The court analyzed her motion under Rule 60.02(3), which allows courts to grant relief if the judgment is void due to a lack of subject matter jurisdiction.[5] *See Turner v. Turner*, 473 S.W.3d 257, 269 (Tenn. 2015). In reaching its determination that Defendant had standing to pursue custody and visitation, the trial court considered two statutes from Chapter 2, Title 36 of the Tennessee Code that pertain to establishing parentage of a child: Tennessee's "presumption of parentage" statute, Tenn. Code Ann. § 36-2-304, and Tennessee's in vitro fertilization statutes, Tenn. Code Ann. §§ 36-2-401 to -403.

Specifically, the trial court considered the "holding out" provision of Tennessee Code Annotated § 36-2-304, which provides that "[a] man is rebuttably presumed to be the father of the child if . . . [, w]hile the child is under the age of majority, the man receives the child into the man's home and openly holds the child out as the man's natural child." *Id*. § 304(a)(4). Although this statute uses gender-specific language, the court applied Tenn. Code Ann. § 1-3-104(b), which permits a gender-neutral construction "except when the contrary intention is manifest."[6] The trial court reasoned that, prior to *Obergefell*, marriage was defined as a matrimonial union between a man and a woman; consequently, it was

---

from the operation of the judgment." Plaintiff's motion did not specify the section in Rule 60.02 under which she was seeking relief.

[5] At the hearing, Plaintiff informed the court that she was seeking relief under section (5) of Rule 60.02, but the court found section (3) to be more applicable to her issues.

[6] Tennessee Code Annotated § 1-3-104(b) states that "[w]ords importing the masculine gender include the feminine and neuter, except when the contrary intention is manifest."

clearly manifest that the parentage statutes referred exclusively to men or putative fathers. But the court further reasoned:

> [A]s a result of *Obergefell v. Hodges*, we now know that such verbiage, though manifest, is unconstitutional. As a result, a statute referring to a person by gender is not as "manifest" as it once seemed. Indeed, the constitutionality of such statutes is now suspect and uncertain. Further, modern advancements in reproductive technology have created problems for the courts in applying the rigidity of the black letter law in determining the actual legal parents of a child. These advances and the changes in social mores have outpaced legislation designed to deal with these unique circumstances. Unfortunately, the lives of minor children cannot be put on hold for the law to catch up and properly deal with these issues.

Applying § 104(b)'s rule of construction, and reading the language in the statute in a gender-neutral manner, the court determined that Defendant qualified for the presumption of parentage in § 36-2-304(a)(4).[7] In doing so, the court based its determination on the following undisputed facts:

> Defendant paid for all of the expenses associated with [Plaintiff]'s impregnation and the birth of the children, the children bear the Defendant's last name of Potts, and it was the intent of the parties to create these children and raise them as joint parents. Further, the Defendant listed [Plaintiff] and minor children as dependents on her work-related major medical insurance and as beneficiaries on her life insurance.

---

[7] The Tennessee Attorney General has opined that using a gender-neutral construction of state statutes may be necessary to comport with the holding in *Obergefell*:

> There are many provisions in the Tennessee Code that use the words "husband," "wife," "father," "mother," "woman," "man," or other gender-specific words such as "testator" or "foreman." Construed literally . . . —and depending on the context—some, but certainly not all, such statutes might run afoul of the holding in *Obergefell*.

Op. Tenn. Att'y Gen. No. 17-29 (April 13, 2017). Applying the same reasoning, the dissent in *Pippin v. Pippin*, No. M2018-00376-COA-R3-CV, 2020 WL 2499633 (Tenn. Ct. App. May 14, 2020) contended that the word "husband" in Tennessee's artificial insemination statute, Tenn. Code Ann. § 68-3-306, "must be interpreted to include both the male and female genders" in order to comport with the United States Supreme Court's decisions in *Obergefell* and *Pavan*. *Pippin*, 2020 WL 2499633, at *11 (Bennett, J. dissenting); *see Obergefell*, 576 U.S. at 670, 675–76 (holding that same-sex spouses are entitled to "the constellation of benefits that the States have linked to marriage"); *see also Pavan*, --- U.S. at ----, 137 S. Ct. at 2078 ("[R]elevant state laws [are] unconstitutional to the extent they treat[] same-sex couples differently from opposite-sex couples." (citing *Obergefell*, 576 U.S. at 670)).

And, considering that the parties entered into an agreed permanent parenting plan providing that Defendant was the legal parent of the children, the court determined that Plaintiff had not rebutted § 304(a)'s presumption.

The trial court also applied Tennessee's statutes establishing the parentage of children born as a result of "embryo transfer," Tenn. Code Ann. §§ 36-2-401 to -403. Specifically, Tenn. Code Ann. § 36-2-401 states:

> This chapter provides a single means to establish parentage of children born of donated embryo transfer to [the] recipient intended parent. It is intended to promote the interests of children who may be born as a result of donated embryo transfer. It is the intent that no adoption pursuant to chapter 1 of this title or no parentage pursuant to chapter 3 of this title shall be required to create parentage in [the] recipient intended parent pursuant to this part.

As the trial court noted, "recipient intended parent" is defined as "a person or persons who receive a relinquished embryo and who accepts full legal rights and responsibilities for such embryo and any child that may be born as a result of embryo transfer." Tenn. Code Ann. § 36-2-402(6). And the "legal embryo custodian" is defined as "the person or entity, *including the embryo transfer clinic*, who hold the legal rights and responsibilities for a human embryo and who relinquishes said embryo to another person." *Id*. § 402(5) (emphasis added).

With those definitions in mind, the trial court considered Tenn. Code Ann. § 36-2-403, which provides in relevant part:

> (a)(1) A legal embryo custodian may relinquish all rights and responsibilities for an embryo prior to embryo transfer. A written contract shall be entered into as appropriate when establishing embryo parentage prior to embryo transfer for the legal transfer of rights to an embryo and to any child that may result from the embryo transfer:
>
> .   .   .
>
> (B) Between a legal embryo custodian and each recipient intended parent.
>
> .   .   .
>
> (d) A child born to a recipient intended parent as the result of embryo relinquishment pursuant to subsection (a) shall be presumed to be the legal child of the recipient intended parent; provided, that each legal

embryo custodian and each recipient intended parent has entered into a written contract pursuant to this part.

In applying these statutes to the case at bar, the trial court determined:

[B]oth "recipient intended parents" entered into a written contract with Georgia Reproductive Specialists listing both the Plaintiff and the Defendant as intended parents. Pursuant to T.C.A. § 36-2-403(d), the resulting child shall be presumed to be the legal child of the "recipient intended parents." The Plaintiff argues that T.C.A. § 36-2-403 does not apply because the Plaintiff's eggs were not donated. The Court disagrees with the argument that this [statute] does not apply. As noted above, there is no legal definition of "donated embryo." Although the Plaintiff's eggs were not donated, the semen was. The eggs were not viable fetuses. The resulting embryos only existed by virtue of the donated sperm. The viable embryos were then in the custody of the fertility clinic. The clinic subsequently transferred the viable embryos via a medical procedure into the uterus of the Plaintiff, one of the recipient intended parents. The parties had a written contract with the clinic accepting the rights and responsibilities for the embryos and any children that resulted therefrom. The Legislative intent is clearly set forth in T.C.A. § 36-2-401: "It is the intent that no adoption pursuant to chapter 1 of this title or no parentage pursuant to chapter 3 of this title shall be required to create parentage in recipient intended parent (sic) pursuant to this part."

Having found that Defendant had standing to pursue custody of the children under Tenn. Code Ann. § 36-2-304(a)(4) and Tenn. Code Ann. §§ 36-2-401 to -403, the court concluded as follows:

The United States Supreme Court's ruling in *Obergefell v. Hodges* has recognized the right of same-sex couples to wed and have conferred upon them the same rights of their heterosexual brothers and sisters, to break the hearts of their spouses by divorce. What has not been conferred upon them is the right to break the hearts of their children by stripping from them a loving parent. In this brave new world, where new human life is often created in a Petri dish and the definition of a parent is now blurred, indistinct and uncertain, this Court will default to the best interest of the children. Under these facts, it will take a court superior to this Court to strip these children of a parent they have known all their lives and the emotional and financial support she provides.

Based on these and other facts and authority set forth in its ruling, the trial court denied Plaintiff's Rule 60.02 motion for relief from the judgment. Plaintiff filed a motion to alter or amend the court's decision, which the trial court denied. This appeal followed.

ANALYSIS

The dispositive issue in this appeal is whether the final divorce decree, with respect to the permanent parenting plan, was void for lack of subject matter jurisdiction.[8] To make this determination, however, we must first consider whether section (3) or (5) of Rule 60.02 applies and then determine which standard of review applies.

### I. TENNESSEE RULE OF CIVIL PROCEDURE 60.02

Plaintiff contends the trial court erred by analyzing her motion under section (3) of Rule 60.02 instead of section (5). We disagree.

Plaintiff's Rule 60.02 motion failed to identify the section upon which she relied; however, at the hearing on the motion, Plaintiff informed the court that she was seeking relief under section (5) of Rule 60.02. Following a discussion, the trial court found section (3) to be applicable because her claim was based on a lack of subject matter jurisdiction.

Rule 60.02 of the Tennessee Rules of Civil Procedure provides:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud . . . ; **(3) the judgment is void**; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated . . . ; or (5) any other reason justifying relief from the operation of the judgment.

(Emphasis added).

Under section (3), a court may relieve a party from a final judgment if the judgment is void due to a lack of subject matter or personal jurisdiction. *See Turner*, 473 S.W.3d at 268. That said, Plaintiff contends the trial court should have analyzed her claim under

---

[8] The issues, as framed by the appellant, read:

1.  Whether the court erred when it denied Cedra Potts (Taylor)'s Rule 60.02(5) Motion to Set Aside the final decree?

2.  Whether the court has subject matter jurisdiction to ratify an agreed upon Marital Dissolution Agreement and Parenting Plan making a non-biological, non-gestational same sex spouse a natural parent to children where there is no biological or gestational connection to the children and the children were not born within 300 days of the marriage?

section (5), which affords relief for any other justifiable reason, usually "in the most extreme, unique, exceptional, or extraordinary cases." *Holiday v. Shoney's South, Inc.*, 42 S.W.3d 90, 94 (Tenn. Ct. App. 2000). Significantly, however, section (5) "generally applies only to circumstances other than those contemplated in sections (1) through (4) of Rule 60.02." *Id.* (citations omitted). Furthermore, Plaintiff agreed to the permanent parenting plan granting Defendant visitation, and Rule 60.02(5) cannot "be used to relieve a party from free, calculated, and deliberate choices [it] has made." *Federated Ins. Co. v. Lethcoe*, 18 S.W.3d 621, 625 (Tenn. 2000) (quoting *Banks v. Dement Const. Co.*, 817 S.W.2d 16, 19 (Tenn. 1991)).

As noted in Ferguson v. Brown, "to give effect to the substance of the motion according to the relief sought, [the court] will review the issue based on the applicable legal standard, regardless of the rule referenced by [the movant] in his motion." 291 S.W.3d 381, 387 (Tenn. Ct. App. 2008) (citations omitted). Therefore, we hold that the trial court did not err by analyzing Plaintiff's issues under Rule 60.02(3).

## II. STANDARD OF REVIEW

Generally, we review a trial court's decision to grant or deny a Rule 60.02 motion under the abuse of discretion standard; however, as the Tennessee Supreme Court noted in *Turner*, subject matter jurisdiction is a question of law that we review pursuant to the de novo standard. 473 S.W.3d at 269. Therefore, as *Turner* instructs, we are to apply the "de novo [standard of] review, with no presumption of correctness, when reviewing a trial court's ruling on a Tennessee Rule 60.02(3) motion to set aside a judgment as void." *Id.*

## III. SUBJECT MATTER JURISDICTION

"Subject matter jurisdiction refers to the power of a court to adjudicate the particular category or type of case brought before it." *Id.* Subject matter jurisdiction "can only be conferred on a court by the constitution or a legislative act." *Chapman v. DaVita, Inc.*, 380 S.W.3d 710, 712 (Tenn. 2012). It "either exists or it does not." *State ex rel. Comm'r of Dep't of Transp. v. Thomas*, 336 S.W.3d 588, 605 (Tenn. Ct. App. 2010). "The parties cannot confer subject matter jurisdiction on a trial or an appellate court by appearance, plea, consent, silence or waiver." *Staats v. McKinnon*, 206 S.W.3d 532, 542 (Tenn. Ct. App. 2006) (citations omitted).

While subject matter jurisdiction focuses on the claim and whether the court has the power to adjudicate it, *see Chapman*, 380 S.W.3d at 712, the doctrine of standing focuses on the party asserting the claim and whether that party "is entitled to pursue judicial relief," *City of Memphis v. Hargett*, 414 S.W.3d 88, 97 (Tenn. 2013). When a statute specifically designates who may bring a cause of action, "the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Hargett*, 414

S.W.3d at 98 n.8 (quoting *Osborn*, 127 S.W.3d at 740).[9] The Tennessee Supreme Court's decisions in *Osborn v. Marr* and *Lovlace v. Copley*, 418 S.W.3d 1 (Tenn. 2013) illustrate this principle.

In *Osborn*, the Court determined that standing was interwoven with subject matter jurisdiction for the purposes of Tenn. Code Ann. § 36-1-113(b) because the statute designated who could bring a petition to terminate parental rights:

> The prospective adoptive parent(s) of the child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, a court appointed special advocate (CASA) agency, or the department shall have standing to file a petition pursuant to this part or pursuant to title 37 to terminate parental or guardianship rights of a person alleged to be a parent or guardian of such child. The prospective adoptive parents shall have standing to request termination of parental or guardianship rights in the adoption petition filed by them pursuant to this part.

127 S.W.3d at 739 (quoting Tenn. Code Ann. § 36-1-113(b)). Thus, the Supreme Court reasoned that the trial court's power to adjudicate such a petition was dependent on the status of the party or parties who filed it. *Id.* at 740.

Likewise, in *Lovlace*, the Tennessee Supreme Court held that standing was jurisdictional for the purposes of Tenn. Code Ann. § 36-6-306, Tennessee's grandparent visitation statute, because the statute provided:

> Any of the following circumstances, when presented in a petition for *grandparent* visitation . . . necessitates a hearing if such *grandparent* visitation is opposed by the custodial parent or parents or custodian or if the *grandparent* visitation has been severely reduced by the custodial parent or parents or custodian . . . .

---

[9] Our courts recognize two types of standing—constitutional standing and non-constitutional standing. *Hargett*, 414 S.W.3d at 97. "Non-constitutional standing focuses on considerations of judicial restraint, such as whether a complaint raises generalized questions more properly addressed by another branch of the government, and questions of statutory interpretation, such as whether a statute designates who may bring a cause of action or creates a limited zone of interests." *Id.* at 98. "Ordinarily, issues of non-constitutional standing are not essential to subject matter jurisdiction and are waived if not properly preserved." *Id.* at 98 n.8. Because subject matter jurisdiction is not waivable, *see Staats*, 206 S.W.3d at 542, the issue of standing cannot be waived when a statute designates who may bring a cause of action, *see Hargett*, 414 S.W.3d at 98 n.8.

- 11 -

*Id*. § 306(a) (emphasis added). Thus, the Court held that, if the Lovlaces did not meet the statutory definition of "grandparent," the trial court did not have subject matter jurisdiction to grant visitation. *Lovlace*, 418 S.W.3d at 17.

Here, Tenn. Code Ann. § 36-6-106(a) requires courts to make a custody determination in divorce actions that involve the custody of minor children:

> In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both ***parents*** to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.

(Emphasis added). A related statute—Tenn. Code Ann. § 36-6-101(a)(3)(A)—states:

> Except when the court finds it not to be in the best interests of the affected child, each order pertaining to the custody or possession of a child arising from an action for absolute divorce, divorce from bed and board or annulment shall grant to each ***parent*** the rights listed in subdivisions (a)(3)(B)(i)–(vi) during periods when the child is not in that parent's possession or shall incorporate such rights by reference to a prior order. Other orders pertaining to custody or possession of a child may contain the rights listed in subdivisions (a)(3)(B)(i)–(vi).

(Emphasis added).

Clearly, Tenn. Code Ann. §§ 36-6-101 and -106 grant the court the power to award custody and visitation and associated rights to a parent of the children; therefore, "the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn*, 127 S.W.3d at 740. As such, if Defendant did not fit the statutory definition of "parent," she did not have standing to pursue her claims and, accordingly, the court did not have jurisdiction to grant visitation.

IV.  WHETHER DEFENDANT HAD STANDING

Whether Defendant had standing and whether the trial court had subject matter jurisdiction requires us to construe the term "parent" under Tennessee's custody and visitation statutes. When construing statutes, our task "is to ascertain and effectuate the legislature's intent." *Kite v. Kite*, 22 S.W.3d 803, 805 (Tenn. 1997). If the language in a statute is unambiguous, "we must apply its plain meaning without a forced interpretation

that would limit or expand the statute's application." *State v. Walls*, 62 S.W.3d 119, 121 (Tenn. 2001); *see Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000) (reasoning that "it is not for the courts to alter or amend a statute"). When the statute is ambiguous, "we may reference the broader statutory scheme, the history of the legislation, or other sources." *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

While Tennessee's custody and visitation statutes do not provide a definition of "parent," there are other statutes in title 36—which establishes the law on "Domestic Relations"—that do. In looking to those statutes for guidance, we apply the principle of statutory construction that "[s]tatutes '*in pari materia*'—those relating to the same subject or having a common purpose—are to be construed together." *Owens v. State*, 908 S.W.2d 923, 926 (Tenn. 1995). The trial court looked to, *inter alia*, two sets of provisions in chapter 2 of title 36: the "presumption of parentage" statute, Tenn. Code Ann. § 36-2-304, and the in vitro fertilization statutes, Tenn. Code Ann. §§ 36-2-401 to -403. Our analysis will focus on §§ 36-2-401 to -403 because the children at issue in this case were born as a result of in vitro fertilization, and the purpose of Tenn. Code Ann. §§ 36-2-401 to -403 is to provide a single means of establishing the parentage of children born through the in vitro fertilization procedure. Tenn. Code Ann. § 36-2-401.

Tennessee Code Annotated § 36-2-403(a)(1)(B) provides that a legal embryo custodian—the embryo transfer clinic—must enter into a written contract with the "recipient intended parent" or parents transferring full legal rights to the embryo or embryos, and to any children that may result, to the recipient intended parent or parents. *See* Tenn. Code Ann. § 36-2-402(5) (defining "legal embryo custodian" as including the embryo transfer clinic); *see also* Tenn. Code Ann. § 36-2-402(6) (defining "recipient intended parent" as "a person or persons who receive a relinquished embryo and who accepts full legal rights and responsibilities for such embryo and any child that may born as a result of embryo transfer"). Provided that the legal embryo custodian and the recipient intended parents have entered into a written contract in accordance with § 403(a), a child born of the in vitro fertilization procedure "shall be presumed to be the legal child of the recipient intended parent." Tenn. Code Ann. § 36-2-403(d).[10] More specifically, as the

---

[10] Specifically, Tenn. Code Ann. § 36-2-403 provides:

(a)(1)   A legal embryo custodian may relinquish all rights and responsibilities for an embryo prior to embryo transfer. A written contract shall be entered into as appropriate when establishing embryo parentage prior to embryo transfer for the legal transfer of rights to an embryo and to any child that may result from the embryo transfer:

(A) Between legal embryo custodians and the embryo transfer clinic; or

(B) Between a legal embryo custodian and each recipient intended parent.

- 13 -

Tennessee Supreme Court explained in *In re Baby*, 447 S.W.3d 807 (Tenn. 2014), under § 36-2-403, the child "shall be considered the child of each intended parent who is a party to the contract, without any further requirement to terminate the genetic parents' rights or for the intended parents to adopt." *Id.* at 831 (citing Tenn. Code Ann. § 36-2-403(d)).

The documents from Georgia Reproductive Specialists constitute a contract between Georgia Reproductive Specialists and the parties to create embryos using Plaintiff's eggs and donated sperm and to implant the embryos into Plaintiff. The legal embryo custodian, Georgia Reproductive Specialists, signed these documents along with Plaintiff and Defendant prior to the procedure. Plaintiff and Defendant signed the documents as "Patient" and "Partner," respectively, and both Plaintiff and Defendant signed as "Prospective Parent." Because Plaintiff and Defendant contractually agreed to accept full legal rights and responsibilities for the embryos and any children that resulted, they are the recipient intended parents under the statute.

Plaintiff concedes that Defendant was a party to the contract with Georgia Reproductive Specialists, but she contends the in vitro fertilization statutes do not apply to Defendant because the embryos that were subject to the contract were not donated, as required by Tenn. Code Ann. § 36-2-401. The statute states, "This chapter provides a single means to establish parentage of children born of ***donated embryo*** transfer to [the] recipient intended parent." *Id.* (emphasis added). Plaintiff contends that a "donated embryo" results

---

(2)     The contract shall be signed, as appropriate, by each legal embryo custodian for such embryo, by the embryo transfer clinic or by each recipient intended parent in the presence of a notary public. Initials or other designations may be used if the individuals desire anonymity.

(b)     If the embryo was created using donor gametes, the sperm or oocyte donors who irrevocably relinquished their rights in connection with in vitro fertilization shall not be entitled to any notice of the embryo relinquishment, nor shall their consent to the embryo relinquishment be required.

(c)     Upon embryo relinquishment by each legal embryo custodian pursuant to subsection (a), the legal transfer of rights to an embryo shall be considered complete at the time of thawing or to such other time as the parties may agree, and the embryo transfer shall be authorized.

(d)     A child born to a recipient intended parent as the result of embryo relinquishment pursuant to subsection (a) shall be presumed to be the legal child of the recipient intended parent; provided, that each legal embryo custodian and each recipient intended parent has entered into a written contract pursuant to this part.

(e)     Any and all prior legal embryo custodians whose donation of an embryo has resulted in the birth of a child to a recipient intended parent pursuant to subsection (a) shall have no rights or responsibilities with such child and of the child to them.

when both the sperm and the egg are donated, and the embryos in this case were created from Plaintiff's eggs.

The in vitro fertilization statutes do not define "donated embryo," but a case decided by the Tennessee Supreme Court prior to the enactment of §§ 36-2-401 to -403, *In re C.K.G.*, 173 S.W.3d 714 (Tenn. 2005), is factually similar to the case at bar and sheds some light on how we should construe these statutes. In looking to *In re C.K.G.* for guidance, we resort to the following well-established canon of statutory construction:

> The General Assembly is presumed to know the state of the existing law when it enacts legislation. This presumption includes the General Assembly's knowledge of the state of the common law when it enacts legislation. Thus, legislative acts are construed with reference to the common law and should not be construed to displace the common law any further than they expressly declare or necessarily imply. To the extent that a legislative act does not supersede the common law, the common law continues in force.

*Seals v. H & F, Inc.*, 301 S.W.3d 237, 257 (Tenn. 2010) (Koch, J., concurring in part, dissenting in part) (citations omitted).

In *In re C.K.G.*, a dispute arose between an unmarried man and woman who decided to have children together through in vitro fertilization. 173 S.W.3d at 717. They entered into a contract with a reproductive clinic to produce embryos using donor eggs and the man's sperm and to have the embryos implanted in the woman. *Id*. at 717–18. The procedure was successful, and the woman gave birth to triplets. *Id*. at 718. When the parties' relationship deteriorated, the woman filed a parentage action seeking custody and child support. *Id*. In response, the man sought sole custody, arguing that, because the woman was not biologically related to the children, she did not qualify as a parent under Tennessee law and thus did not have standing to seek custody. *Id*. at 718–19.

Upon reviewing Tennessee's parentage statutes as they existed at that time, the Court found that the statutes were not helpful in resolving a custody dispute arising from the in vitro fertilization procedure. *Id*. at 722–23. This was in part because, under these statutes, parentage was premised on the parties' biological relationship to the children. *Id*. at 722. The Court opined that this was problematic considering that the "technological fragmentation of the procreative process, insofar as it includes techniques for egg and sperm donation and preservation, has engendered a bewildering variety of possibilities which are not easily reconciled with our traditional definitions of 'mother,' 'father,' and 'parent.'" *Id*. at 721.

- 15 -

Nevertheless, the Court held that, though the woman lacked a biological relationship to the triplets, she was their "legal mother." *Id*. at 730. This holding was based, in part, on the fact that the woman and man "voluntarily demonstrated the bona fide intent that [the woman] would be the children's legal mother and agreed that [she] would accept legal responsibility as well as the legal rights of parenthood." *Id*. The Court concluded its decision with a call for the General Assembly to act: "Given the far-reaching, profoundly complex, and competing public policy considerations necessarily implicated by the present controversy, we conclude that crafting a general rule to adjudicate all controversies so implicated is more appropriately accomplished by the Tennessee General Assembly." *Id*.

The Court decided *In re C.K.G.* in 2005. The General Assembly enacted Tenn. Code Ann. §§ 36-2-401 to -403 in 2013. Thus, we presume that, in doing so, the General Assembly intended to address the issues raised by *In re C.K.G.*—circumstances such as this one, where the parties clearly intend to become parents through in vitro fertilization, and one or both of the parties is not biologically related to the child or children produced as a result of that procedure.[11] Moreover, we find nothing in the statute that explicitly requires that all of the gametes be donated in order for the statute to apply, nor is it even implied. Rather, we read § 36-2-403 as contemplating circumstances such as this one where either the sperm *or* the egg ("oocyte") is donated, as well as situations where both are donated:

> If the embryo was created using donor gametes, the sperm *or* oocyte donors who irrevocably relinquished their rights in connection with in vitro fertilization shall not be entitled to any notice of the embryo relinquishment, nor shall their consent to the embryo relinquishment be required.

---

[11] Tennessee Code Annotated § 36-2-401 states, "It is the intent that no adoption pursuant to chapter 1 of this title or **no parentage pursuant to chapter 3 of this title** shall be required to create parentage in [the] recipient intended parent pursuant to this part." (Emphasis added). Chapter 3 of title 36 concerns marriage. Thus, the legislature expressed its intent that the marital status of the parties would not be relevant when establishing parentage in accordance with the embryo transfer statutes. This is not the case with Tennessee's artificial insemination statute, Tenn. Code Ann. § 68-3-306, which requires that the parties be married at the time of the child's birth. *See In re C.K.G.*, 173 S.W.3d at 728. As such, the artificial insemination statute has been problematic for same-sex couples who conceived children through artificial insemination prior to the *Obergefell* decision legally recognizing same-sex marriage. The same-sex couple in *Pippin*, for example, conceived a child through an artificial insemination procedure when the law in Tennessee limited marriage to opposite-sex couples. 2020 WL 2499633, at *12. The dissent argued that there was no difference between the plaintiff "and the 'husband' in Tenn. Code Ann. § 68-3-306 except for a marriage that the State of Tennessee would not allow" due to the State's unconstitutional law forbidding same-sex marriage. *Id*. at *12. Because the embryo transfer statutes are gender neutral and do not reference the marital status of the parties, we need not consider the effect of *Obergefell* in this case.

*Id*. § 403(b) (emphasis added). Therefore, considering the language of the statute and the circumstances surrounding its enactment, we agree with the trial court's determination that "donated embryo" refers to an embryo created from donated sperm, a donated egg, or both.

In addressing the issues raised by the in vitro fertilization procedure, the legislature clearly expressed its intent that contract principles—not biology—would control the question of parentage. Specifically, the parentage inquiry centers on whether the parties contractually agreed to accept "full legal rights and responsibilities for such embryo and any child that may be born as a result of embryo transfer." Tenn. Code Ann. § 36-2-402(6). Likewise, the Court held in *In re C.K.G.* that the non-biologically-related woman was the children's legal mother because she accepted "legal responsibility and the legal rights of parenthood." 173 S.W.3d at 730. Importantly, in *In re C.K.G.*, the man's status as the biological parent did not give him an advantage over the woman, *id.*, and, under § 36-2-403, Plaintiff's status as the biological parent does not place her in a superior position to that of Defendant. Rather, because both parties in this case contractually agreed to accept legal responsibility for the embryos and any children born as a result, they are on an equal footing as the parents of the children.

In years past, parental rights were premised on the parties' biological relationship to the children and the parties' marital status at the time of the children's birth. *See State ex rel. Cihlar v. Crawford*, 39 S.W.3d 172, 181–83 (Tenn. Ct. App. 2000). This was based on society's past understanding of "family" as the traditional nuclear family—"a married heterosexual couple and their children, if any." *In re Bernard T.*, 319 S.W.3d 586, 597 (Tenn. 2010). But, the traditional nuclear family is no longer the typical American family. *Id*. With increased rates of divorce, non-marital childbearing, and same-sex marriage—and advances in reproductive technology—our society's understanding of what constitutes a family has changed, and the legal definition of "parent" has slowly changed with it, as it must. *See id*. at 597–98.

Thus, for the foregoing reasons, we hold that Defendant is a parent of the minor children. Because Defendant is a parent of the children, she had standing to seek custody and visitation in the divorce proceeding. As a consequence, the trial court had subject matter jurisdiction to preside over the competing claims and to, *inter alia*, enter an order approving the agreed-upon permanent parenting plan. Resultantly, the permanent parenting plan is not void for lack of subject matter jurisdiction. For these reasons, we affirm the trial court's decision to deny Plaintiff's Rule 60.02 motion.

## IN CONCLUSION

Having determined that Defendant is a legal parent of the children, we hold that the trial court had subject matter jurisdiction to award custody and visitation and affirm its decision to deny Plaintiff's Rule 60.02 motion. Accordingly, we affirm the trial court in all respects, and this matter is remanded with costs of appeal assessed against Cedra Deanntre Potts (Taylor).

_____
FRANK G. CLEMENT JR., P.J., M.S.